## IN THE UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF KANSAS

| | |
|---|---|
| **UNITED STATES OF AMERICA,** | ) |
| Plaintiff, | ) |
| v. | ) No. 10-20049-03-CM |
| **EDMUND NWAUDOBI,** | ) |
| Defendant. | ) |

### MEMORANDUM AND ORDER

This case is before the court on defendant Edmund Nwaudobi's Motion for Judgment of Acquittal or, in the Alternative, For New Trial (Doc. 111). On February 15, 2012, a jury convicted defendant of the four counts against him, which included one count of conspiracy to commit health care fraud (Count 1), two counts of health care fraud (Counts 6 and 7), and one count of aggravated identity theft (Count 12). Defendant seeks a judgment of acquittal under Federal Rule of Criminal Procedure 29 or, alternatively, a new trial pursuant to Federal Rule of Criminal Procedure 33, alleging error in the admission of a photo lineup and insufficient evidence to support the verdicts and/or that the verdicts were against the weight of evidence. For the following reasons, the court denies the motion.

### I.   Standard for Judgment

In evaluating a motion for judgment of acquittal, the court must determine whether, taken in the light most favorable to the government, there is substantial evidence from which a reasonable jury could properly find defendant guilty beyond a reasonable doubt. *See United States v. Hudson*,

813 F. Supp. 2d 1482, 1492 (D. Kan. 1993) (quoting *United States v. Johnson*, 911 F.2d 1394, 1399 (10th Cir. 1990)). The government is entitled to the benefit of all reasonable inferences consistent with the evidence at trial. *Id*. (citing *United States v. Dickey*, 736 F.2d 571, 583 (10th Cir. 1984)). "The court should enter a judgment of acquittal only if the evidence that the defendant committed the crime is nonexistent or so meager that no reasonable jury could find guilt beyond a reasonable doubt." *United States v. White*, 673 F.2d 299, 301 (10th Cir. 1982).

In considering a motion for new trial, the court has broad discretion that will not be disturbed on appeal absent plain abuse of that discretion. *United States v. Troutman*, 814 F.2d 1428, 1455 (10th Cir. 1987). The standards for granting a new trial are not as strict as the standards for granting judgment of acquittal. Federal Rule of Criminal Procedure 33 provides that a court may grant a new trial "if the interest of justice so requires." Additionally, any error which would require reversal on appeal is a sufficient basis for granting a new trial. *United States v. Walters*, 89 F. Supp. 2d 1206, 1213 (D. Kan. 2000) (quotation and citation omitted). The court may weigh the evidence and assess witness credibility. *United States v. Quintanilla*, 193 F.3d 1139, 1146 (10th Cir. 1999) (citation omitted). The court should grant a motion for a new trial if, "after weighing the evidence and the credibility of the witnesses, the court determines that 'the verdict is contrary to the weight of the evidence such that a miscarriage of justice may have occurred.'" *United States v. Gabaldon*, 91 F.3d 91, 93–94 (10th Cir. 1996) (quoting *United States v. Evans*, 42 F.3d 586, 593 (10th Cir. 1994)). But courts disfavor new trials, *United States v. Gleeson*, 411 F.2d 1091, 1093 (10th Cir. 1969), and exercise great caution in granting them, *United States v. Sinclair*, 109 F.3d 1527, 1531 (10th Cir. 1997). The burden of proving that a new trial is warranted rests on the defendant. *Walters*, 89 F. Supp. 2d at 1213 (citations omitted).

## II. Discussion

**Government's Burden**

Defendant's argument in support of his request for acquittal or a new trial is that the evidence presented at trial was insufficient to support the jury's verdicts. He specifically argues—as he did at trial—that the government's evidence was entirely circumstantial.

To prove conspiracy, the government must establish, beyond a reasonable doubt, (1) that two or more persons agreed to violate the law; (2) that one of the co-conspirators engaged in at least one overt act furthering the conspiracy's objective; (3) that the defendant knew at least the essential objectives of the conspiracy; (4) that the defendant knowingly and voluntarily became a part of it; and (5) that the alleged co-conspirators were interdependent.

To prove health care fraud, the government must establish, beyond a reasonable doubt, (1) that the defendant knowingly devised or participated in a scheme to defraud by false pretenses, money and/or property owned by Medicare; (2) that the defendant acted with the intent to defraud; and (3) that Medicare was a public plan or entity providing medical benefits.

To prove aggravated identity theft, the government must establish, beyond a reasonable doubt, that the defendant knowingly used another person's means of identification or identification documents, without lawful authority, during and in relation to health care fraud.

Additionally, the government charged defendant as an aider and abettor. To establish guilt on an aiding and abetting theory, the government must establish, beyond a reasonable doubt, that someone else committed the charged crime(s); and that defendant intentionally associated himself in some way with the crime and intentionally participated in it as he would in something he wished to bring about.

The evidence is sufficient to support a conviction if, viewed in the light most favorable to the

government, a rational trier of fact could have found the elements of the crime beyond a reasonable doubt. *United States v. Tranakos*, 911 F.2d 1422, 1430 (10th Cir. 1990) (citing *Jackson v. Virginia*, 443 U.S. 307, 319 (1979)).

**Sufficiency of the Evidence**

First, the court finds that the jury had the opportunity to observe the witnesses, to evaluate their testimony, and to determine their credibility. The jury was also able to observe and inspect all the documentary evidence in this case, including the great deal of evidence relating to Medicare claims and bank account records. And the jury was properly instructed on the government's burden in the case as well as the elements of the charged offenses.

The defendant is correct that the government's evidence was circumstantial evidence. However, this evidence clearly showed that four companies, United Medical Services, Inc., (UMS); Tal-Med Inc., (Tal-Med); Central Medical Inc., (CMI); and Good Care, Inc., (Good Care) all submitted claims to Medicare for beneficiaries living in Kansas City, Kansas. And the evidence showed that each of the companies billed Medicare for expensive items—such as power wheelchairs—and were reimbursed for these items, but that the companies provided either no items or inferior items—such as scooters—to the beneficiaries. Many beneficiaries testified about how they were approached; how they provided their Medicare numbers; how, for the most part, they did not have doctor's prescriptions for the devices and/or that the devices were not medically necessary; and how they did not have to pay anything for the devices. These beneficiaries testified about what, if anything, they actually received from these companies. Other beneficiaries testified that they were unaware that claims were submitted on their behalf; that they did not authorize such claims; or that they did not need the devices for which Medicare was billed.

The government established that the UPIN/NPI numbers—unique physician identification

numbers—associated with physicians allegedly authorizing the devices that the companies were billing to Medicare, were being used by the companies without the physicians' knowledge or authorization. For example, doctors Norman Forester and Maria Palmeri, whose NPIs/UPINs were used on Medicare Summary Notices (MSNs) of claims submitted to Medicare by one or more of the companies, testified that they had never heard of the beneficiaries they had allegedly authorized these devices for; the beneficiaries were not patients of these doctors; and the doctors would not have prescribed this Durable Medical Equipment (DME) to these individuals.

The government established that Good Care primarily billed Medicare for orthotic devices, but did not provide the beneficiaries with any items, let alone the ones that Medicare reimbursed Good Care for. For instance, Good Care billed Medicare for leg braces for C.N., who was a double amputee and obviously had no use for leg braces. The only beneficiary who testified to receiving any item was T.P., who received elastic or neoprene wraps, which she acknowledged were the type one could buy at a local pharmacy. They were not the orthotics billed to and reimbursed by Medicare.

The government established defendant's association with Good Care. Although the company was started by codefendant Iyaye Ishmael in the name of defendant's ex-wife, Ogolisa Nwaudobi, the defendant was the representative manning Good Care's office space in Overland Park, Kansas—and dealing with the landlord at that property—since at least November of 2006. Correspondence related to the company's insurance was directed to defendant's home address in Sugarland, Texas; the coverage was associated with defendant's email address; and a trash pull at defendant's residence revealed a remittance notice for Good Care. Defendant does not contest his association with the company. He merely asserts that the association was innocent, and that the government failed to offer any evidence to establish otherwise. He argued as much to the jury: that, like Ogolisa, he trusted Ishmael and Ishmael "did everything." But the jury was unconvinced.

The defendant's argument downplays the substantial credible evidence presented by the government that established links among the four companies: they were sharing beneficiaries' information; they were using the same doctors' UPINs/ NPIs without their knowledge; and there was money flowing among the bank accounts of the companies and the individual codefendants. For example, the court's recollection is that CMI and Good Care both billed Medicare on behalf of N.C., J.M., and C.N. for devices that they did not receive. UMS and Good Care both billed Medicare on behalf of C.F. and T.P.; and CMI, UMS, and Good Care all billed Medicare on behalf of E.J. None of these individuals received the devices Medicare was billed for. The government suggested that four DME suppliers operating in Kansas City, Kansas, should be competitors: instead they were sharing money. Most significantly, the government emphasized the amounts of money that were changing hands, including evidence suggesting defendant was receiving a large share of profits. Defendant was able to argue, and did argue, that Ishmael, an identity thief, may have been paying himself with checks made out to defendant. But the evidence suggested that, of the checks written to defendant personally, which totaled in the neighborhood of $137,000, only five of these contained fingerprints of value, and all five of these prints belonged to defendant.

One of the beneficiaries testified that, although men had approached him and asked him if he wanted a free scooter, he ultimately declined their offer. When asked why, he said it wasn't right: it was "too much sugar for a dime." This statement became the theme of the government's case. Based on the significant influx of money from Medicare and contracting entities and the large sums defendant was receiving, versus the small amount being paid out for the actual DME, no reasonable person could have believed that the business was above-board. Based on this substantial amount of circumstantial evidence, the government argued that defendant knew of the essential objective: to make money. He received most of the money paid to Good Care, and also received a significant

amount of money from CMI. A rational fact-finder could have found the elements of each of the charged crimes, either as a principal or on an aiding and abetting theory, beyond a reasonable doubt. The verdicts were not contrary to the weight of the evidence.

Direct evidence, as opposed to circumstantial evidence, is not essential to a criminal conviction. *United States v. Harper*, 579 F.2d 1235, 1239 (10th Cir. 1978). Though completely circumstantial, the government's evidence against defendant was substantial. *See Tuttle v. State of Utah*, 57 F.3d 879, 892 (10th Cir. 1995). Together with reasonable inferences that could be drawn from this evidence, the jury's verdict is supported by the evidence and certainly is not against the weight of the evidence. Although it is possible that a different jury might have returned a different verdict, the evidence presented was sufficient to support the verdict rendered here. The court has no grave doubts about the defendant's conviction, nor does it believe a miscarriage of justice occurred here. The motion for acquittal, or in the alternative, a new trial, is denied.

**Admission of Photo Lineup: Government's Exhibit 110G**

T.P., one of the beneficiaries in this case, testified that when agents came to interview her in September of 2009 about a scooter she had received, they asked her to look through some photo lineups. She identified a certain individual or individuals. (Ex. 110F.) At a second interview with agents in December of 2009, concerning some braces or wraps she had received, she looked at another photo lineup and positively identified an individual who appeared to be defendant. (Ex. 110G.) At the time of trial, in February of 2012, she remembered that the agents had shown her the photo lineups and she identified the writing on the pages as her own, but she was not able to recall the significance of the writing. The court admitted Exhibit 110G over defendant's foundation objection. The argument goes to the weight of the evidence. The court finds no error in the admission of this exhibit.

**IT IS THEREFORE ORDERED** that defendant Edmund Nwaudobi's Motion for Judgment of Acquittal or, in the Alternative, For New Trial (Doc. 111) is denied.

Dated this <u>14th</u> day of May 2012, at Kansas City, Kansas.

                                      **s/ Carlos Murguia**
                                      **CARLOS MURGUIA**
                                      **United States District Judge**